United States District Court
Southern District of Texas

**ENTERED**

February 17, 2017

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| REVEILLE TRUCKING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-511 |
| | § | |
| LEAR CORPORATION, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER AND OPINION

Before the Court are Plaintiff Reveille Trucking, Inc.'s ("Reveille's") Motion for Partial Summary Judgment (Document No. 66), Defendant Lear Corporation's ("Lear's") Motion for Summary Judgment and Brief in Support (Document Nos. 67, 68), and the parties' responses and replies (Document Nos. 73, 74, 76, 77). Having considered these filings, the facts in the record, and the applicable law, the Court concludes that Reveille's Motion for Partial Summary Judgment (Document No. 66) is denied, and Lear's Motion for Summary Judgment (Document Nos. 67, 68) is partially granted and partially denied.

## Background

Plaintiff Reveille is a "motor carrier engaged in the performance of interstate carriage for hire" (Document No. 63 at 1), and Defendant Lear is a "tier-one manufacturer of automotive seating and electrical components." (Document No. 68 at 2).[1] Lear used a third-party logistics provider, Ryder Integrated Logistics, Inc. ("Ryder"), to manage its transportation and shipping. (Document No. 66 at 2; Document No. 66-7, Lear/Ryder Commercial Freight Management

---

[1] Plaintiff and the other Defendant in this case, Johnson Controls, Inc., came to a settlement agreement. (Document No. 71).

Services Agreement).[2] Pursuant to the agreement between Lear and Ryder, Ryder was appointed by Lear as its agent, to provide "logistics management services for Lear." (Document No. 66-7 at 1). Ryder then contracted with Piece by Piece Investments, Inc./PBP Logistics, LLC (referred to collectively as "PBP") "to act as motor carrier for the shipment of freight on the D5005 route from Brownsville to Lear's facility in Hammond and back." (Document No. 66 at 4; Document No. 66-9, Ryder/PBP General Terms and Conditions (Motor Carrier)). In addition to the General Terms and Conditions, Ryder also required PBP "to sign an additional agreement in which PBP acknowledged and agreed that it would be prohibited from brokering shipments of freight tendered to it by Ryder/Lear to other motor carriers." (Document No. 66 at 4; Document No. 66-10, Unauthorized Brokering of Freight Agreement). Furthermore, this agreement also required that PBP:

> 1. Use equipment owned or operated by PBP to transport any and all loads tendered to PBP by Ryder for Lear;
> 2. Not broker any loads to another carrier without express authorization from Ryder; and
> 3. To indemnify and defend Ryder and its shippers from any and all claims by third parties which result from any brokering of freight.

*Id*.

Despite these terms, PBP contracted with another company, Tropical Logistics, LLC[3] ("Tropical"), to complete its carrier responsibilities. (Document No. 66 at 5; Document No. 68 at 3). Tropical then contracted with Plaintiff Reveille from October 2013 to January 2014 for transportation of Lear freight for the roundtrip route from Brownsville, Texas to Hammond, Indiana. *Id*. Reveille states that "[i]n those four months, Lear and/or Johnson Controls tendered

---

[2] In addition to the use of Ryder, Lear states that it "also contracts with Cass Integrated Systems, Inc. ("Cass"), to handle billing, review, and payment processing for freight services received from approved carriers, provided to Lear. Invoices and requests for payment are never submitted directly to Lear. Carriers submit billing documentation (shippers, bills of lading, and invoices) directly to Cass, and Cass matches the invoices to carriers from Ryder's file. Bi-weekly, Cass makes payments to all carriers and is reimbursed by Lear." (Document No. 68 at 2).
[3] PBP and Tropical were owned by the same person, Alexander Jones. (Document No. 66 at 5 n. 3).

106 shipments to Reveille for transport in interstate commerce," citing the bills of lading from each Defendant. (Document No. 66 at 6) (citing Document No. 66-12, Lear Bills of Lading; Document No. 66-13, Johnson Controls Bills of Lading). According to the Johnson Controls Bills of Lading, Reveille transported 68 shipments from Brownsville to Lear's location in Hammond. (Document No. 66-13). Johnson Controls is the consignor and Lear is the consignee. *Id*. The Lear Bills of Lading contain record of 38 return shipments of empty containers (from Hammond back to Brownsville), and name Lear as consignor, Johnson Controls as consignee, and Reveille as the "originating carrier." (Document No. 66-12).

The fact that transportation services were contracted out to Reveille is undisputed. However the parties disagree as to whether Lear was aware that this was occurring: Reveille insists that Lear, Ryder, and CSG were aware that PBP contracted out transportation services, while Lear maintains that it was not, and that "neither PBP nor Tropical ever sought or received written approval from Lear or Ryder to subcontract their shipping responsibilities to any carrier." (Document No. 66 at 5-6; Document No. 68 at 3).

Reveille states that, "pursuant to instructions from PBP and Tropical Logistics," it "submitted its invoices and paperwork to Tropical [] for payment of 106 shipments, which totaled $279, 511.00." (Document No. 66 at 7). Reveille received $45,500.00 from Tropical's broker bond, but is still owed the remaining $233,961.00, which has not been paid by PBP or Tropical.[4] *Id*. After this nonpayment, Reveille submitted its invoices and paperwork to Lear, which declined to make payment. *Id*. Lear states that it paid PBP for the services. (Document No. 68 at 6).

Lear insists that it is not liable for these payments, because "Reveille expressly agreed to

---

[4] Drive Logistics and Sunbelt Transportation are two other carriers which were never paid by Tropical or PBP for transporting Lear freight. *Id*. at 6 n. 5.

look solely to Tropical (a corporate entity foreign to Lear System) for payment of its services."
(Document No. 68 at 3-4). Lear bases this argument upon a Master Transportation Agreement
("MTA") between Tropical and Reveille. (Document No. 66-20, MTA). In the MTA Reveille
agrees to the following:

> Carrier [Reveille] agrees that it shall not bill the Customer, shipper/consignee or any third
> party directly nor shall it communicate in any manner, directly or indirectly with Tropical
> Logistics, LLC customers, consignors, consignees or any party other than Tropical
> Logistics, LLC concerning the collection of any charges relating to transportation
> services accruing in connection with or as a consequence of this Contract; and waives any
> right it may otherwise have to proceed or commence any action against any Customer for
> the collection of any freight bills arising out of transportation services performed by
> carrier under this contract.

*Id*. at 3, ¶ 8. The MTA was signed on August 27, 2013 by a "dispatcher" named "Carina
Sobrevillla." *Id*. at 6.

As a result of not being paid for its services, Reveille asserts the following claims against
Lear in its Second Amended Complaint: (1) breach of interstate transportation contracts (the bills
of lading), under which Lear is liable for the cost of the shipments; (2) negligence and gross
negligence, for Lear's failure to ensure that Reveille was paid for its services; (3) unjust
enrichment, because Lear received the benefit of Reveille's services without paying Reveille;
and (4) fraud by nondisclosure, because Lear and its agents had a duty to inform Reveille that
PBP was not making payments. (Document No. 63 at 7-11).

**<u>Parties' Motions</u>**

Plaintiff Reveille asks that summary judgment be entered against Lear on two of its
claims: breach of interstate transportation contracts and unjust enrichment. (Document No. 66 at
1). Reveille first states generally that "transportation cases such as this one begin with the
fundamental premise that, 'absent malfeasance, the carrier gets paid.'" *Id*. at 13 (citing *Exel*

*Transportation Services, Inc. v. CSX Lines LLC*, 280 F. Supp. 2d 617, 619 (S.D. Tex. 2003)).[5] Reveille then argues that Lear materially breached interstate transportation contracts with Reveille, as each bill of lading "constitutes an interstate transportation contract between Lear, Johnson Controls, and Reveille, which Lear and Johnson Controls have breached by failing to pay Reveille." *Id*. at 14. Next, Reveille argues that the MTA does not alter the default terms of the uniform bills of lading. *Id*. at 17. Reveille insists that (1) the MTA is not an enforceable contract, and (2) that the MTA does not waive Reveille's right to recover from Lear. *Id*. at 18-25. Finally, Reveille argues that Lear has been unjustly enriched, because it has breached a contract implied-in-law with Reveille. *Id*. at 26.

Defendant Lear asks that summary judgment be entered on all of Plaintiff's claims. (Document No. 68 at 1). Lear argues that the MTA is an enforceable contract, and that Reveille cannot prevail on its contract claims, because it waived them in the MTA. *Id*. at 7. Lear also states that equitable estoppel prevents Reveille's claims because Reveille continued to make deliveries, allowing the unpaid balance to increase, without notifying Lear that it had not been paid. *Id*. at 20-21. Lear then argues that unjust enrichment does not apply because a valid contract between Reveille and Tropical covered the services. *Id*. at 19-20. In addition, Lear argues that Reveille's negligence claims must fail because Lear did not have a legal duty to Reveille. *Id*. at 15-16. Finally, Lear argues that Reveille fails to state a claim of fraud by nondisclosure, and that Reveille fails to demonstrate that Lear had a duty to disclose. *Id*. at 18.

**Standard of Review**

*Summary Judgment*

---

[5] In that case the Court did explain that shippers are primarily liable for payments, *unless the parties have reallocated that responsibility*. *Exel Transp. Servs., Inc. v. CSX Lines LLC*, 280 F. Supp. 2d 617, 618 (S.D. Tex. 2003). As discussed in detail below, it is the possible reallocation of liability in the MTA that is the key issue in this case.

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing the claims determines the elements essential to the outcome of the case and thus determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250. The moving party bears the burden of identifying evidence that no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view this evidence and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Choice of Laws*

The MTA states that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of Michigan." (Document No. 66-20 at 6). It is well established that where a Court has diversity jurisdiction and there is an issue as to which state's law should control the litigation, the Court applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Therefore this Court will look to Texas choice of law rules. "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied." *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992).[6] Thus the Court will apply Michigan contract law in its interpretation of the MTA.

---

[6] An exception exists, though, "if another jurisdiction has a more significant relationship with the parties and their transaction than the state they choose, that jurisdiction has a materially greater interest than the chosen state, and the jurisdiction's fundamental policy would be contravened by the application of the law of the chosen state." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 705 (5th Cir. 1999). Neither party asserts this exception to the standard rule, and the Court does not believe it applies. Furthermore, neither party suggests that application of Texas law would change the result.

**Discussion**

(1) Breach of interstate transportation contracts

"Since 1919, the ICC has prescribed a uniform bill of lading for use on all interstate domestic shipments of freight by rail. The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982) (citations omitted). "Each term has in effect the force of a statute, of which all affected must take notice. Unless the bill provides to the contrary,[7] the consignor remains primarily liable for the freight charges." *Id*. at 343. "Payment of those charges is the original responsibility of the shipper. This responsibility may be shifted to a third party […] but the transfer of this responsibility must be clearly established by the agreement between the parties or the circumstances surrounding the receipt and transportation of the goods." *Missouri Pac. R. Co. v. Ctr. Plains Indus., Inc.*, 720 F.2d 818, 819 (5th Cir. 1983) (citing *S. Pac. Transp.*, 456 U.S. at 342). *See also Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 956 (9th Cir. 2008) ("The parties to a freight shipment generally are free to assign liability for the payment of freight charges through a contract separate from the bill of lading.") (citing *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 66-67 (1924)).

Default provisions in the bill of lading also provide that, in addition to the consignor's primary liability, "[i]f a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or

---

[7] In some instances, the parties change the terms of the default bill of lading by marking a specific section. For example, a consignor can "effectuate its release from liability by executing the nonrecourse clause in the bill of lading." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343 (1982). *See also C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000) ("If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability.") (citation omitted).

not until later." *Harms Farms Trucking v. Woodland Container*, No. 4:05CV3185, 2006 WL 3483920, at *2 (D. Neb. Nov. 30, 2006) (citing *Louisville*, 265 U.S. at 70). These provisions can also be modified by contract.[8] *See*, *e.g.*, *Oak Harbor*, 513 F.3d at 955.

Reveille argues that Lear, as either consignor or consignee on each relevant bill of lading,[9] is liable for freight charges. (Document No. 66 at 20-21). However, Lear argues that the MTA alters the bills of lading, and waives Reveille's right to recover on the bills of lading. The MTA states:

> Carrier [Reveille] agrees that it shall not bill the Customer, shipper/consignee or any third party directly nor shall it communicate in any manner, directly or indirectly with Tropical Logistics, LLC customers, consignors, consignees or any party other than Tropical Logistics, LLC concerning the collection of any charges relating to transportation services accruing in connection with or as a consequence of this Contract; and waives any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by carrier under this contract.

(Document No. 66-20 at 3, ¶ 8). Assuming for the moment that the MTA is a valid contract, the Court will first consider whether the MTA can waive Reveille's right to recover under the bills of lading. Reveille argues that it cannot, because "Defendants are not parties to the MTA" and "[a] contract between a broker (Tropical Logistics) and a carrier (Reveille) cannot modify the binding terms of bills of lading between a shipper-consignor (Lear and Johnson Controls) and carrier (Reveille)." (Document No. 66 at 28) (citing *Oak Harbor*, 513 F.3d at 956). In response, Lear cites *C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.* (Document No. 68 at 12-14) (citing 213 F.3d 474, 479 (9th Cir. 2000)).

---

[8] Similarly, the consignee is typically released from liability when the prepaid provision is marked on the default bill of lading. *Id.* ("[W]hen the prepaid provision on the bill of lading has been marked and the consignee has already paid its bill to the consignor, the consignee is not liable to the carrier for payment of the freight charges.").
[9] It is undisputed that the bills of lading in question all contained the default terms (*i.e.* the prepaid and nonrecourse provisions were not marked).

The Court agrees with Lear that *C.A.R. Transportation* is more akin to the case at hand.[10]

The facts of that case are as follows:

> Darden purchased frozen shrimp from Trans–Pac in Los Angeles for delivery to Darden's warehouse in Indianapolis, Indiana. Darden's purchase price for the shrimp included freight charges from Trans–Pac's facilities in Los Angeles to Indianapolis. Trans–Pac arranged for the transportation of the shrimp […] through Gulf Atlantic & Pacific Shipper (GAP), a transportation broker. GAP, in turn, contracted with CAR, also a transportation broker, and CAR arranged to have three different motor carriers transport the shrimp to Indiana.
>
> The three shrimp shipments were tendered to [the three carriers] at Trans–Pac's facilities on January 3, January 27, and January 28, 1997, respectively. The invoices and bills of lading for all three shipments designated Trans–Pac as the shipper/consignor and Darden as the consignee. The drivers, as "Authorized Representatives" for the Carriers, each signed a "Waiver of Claim by Subcontractor," waiving[11] any claim the Carriers had

---

[10] In an order denying both parties' motions for summary judgment in a parallel litigation, Judge Rosen of the Eastern District of Michigan discusses this same issue. *Drive Logistics Ltd v. PBP Logistics LLC*, No. 14-10289, 2016 WL 3913709, at *7 (E.D. Mich. July 20, 2016). The Court agrees with that analysis, and will incorporate parts of it into this opinion. That litigation (the "Drive litigation" or "*Drive*") involves Plaintiff Drive, the motor carrier which handled Lear shipments prior to Reveille. (Document No. 66-16; Document No. 66-8 at 50; Document No. 66-17). The shipments were contracted via PBP (referred to therein as the "PBP Defendants"), which did not pay Drive for its services. (Document No. 66 at 6 n. 5; Document No. 66-8 at 50; Document No. 66-11 at 90). Therefore Drive is suing both PBP and Lear. Drive contracted with PBP in an MTA identical to the one at issue in this litigation. 2016 WL 3913709, at *3.

[11] The waivers stated:

> The undersigned motor carrier acknowledges and agrees that:
>
> 1. It is providing contract carriage services to [Trans–Pac] and/or [Trans–Pac's] customer as a subcontractor for another motor carrier or broker;
>
> 2. [Trans–Pac] and [Trans Pac's] customer have made no agreement, express or implied, to pay the undersigned for such services;
>
> 3. The Undersigned will not seek payment from [Trans–Pac] or [Trans–Pac's] customer for such services; and
>
> 4. To the extent the Undersigned is determined to have any legal right to such payment from [Trans–Pac] or [Trans–Pac's] customer, the Undersigned hereby waives such claim.

*C.A.R. Transportation*, 213 F.3d at 479 n. 2. Although the opinion does not explicitly state that Trans-Pac was the party which entered into this contract, the fact that the Court inserted Trans-Pac's name into the quoted portions suggests that may have been the case. *Id.* In the Drive litigation, Judge Rosen notes this as well:

> To be accurate, the opinion in *C.A.R. Transportation* never actually identifies the other party to the agreements in which the carriers waived their right to recover their freight charges from Trans-Pac or its customers. *See C.A.R. Transportation*, 213 F.3d at 476-77 & n.2. For all that appears in the Ninth Circuit's ruling, the plaintiff transportation broker, C.A.R. Transportation, could have been the party that presented the waivers to the carriers for their signatures. If so, the distinction drawn by Plaintiff here would not exist, and the Ninth Circuit would have overlooked its own decision in *C.A.R. Transportation* when it stated in *Oak Harbor* that there appeared to be "no authority" for the "proposition that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading." *Oak Harbor*, 513 F.3d at 956. In any event, this Court fails to see, and the court in *Oak Harbor* does not explain, why a carrier's waiver of rights it otherwise would have under a bill of lading should be effective only if this waiver is contained in a contract with another party to the bill of lading, and not if a transportation broker secures this waiver from the carrier on behalf of its customer.

2016 WL 3913709, at *8 n.10. Furthermore, presumably if GAP or C.A.R. Transportation presented the carriers

against Appellees for the payment of shipping charges. […]

The shipments were transported with reasonable dispatch and delivered in good order. On February 27, 1997, Trans–Pac paid GAP for the shipping charges. CAR billed GAP for the freight charges, but GAP never paid and on July 28, 1997, filed a Chapter 11 bankruptcy proceeding.

*Id*. at 476-7. C.A.R. Transportation therefore filed claims against Darden and Trans-Pac, arguing that, pursuant to the bills of lading, they were liable for the freight charges. The district court granted summary judgment in favor of Darden and Trans-Pac, "holding that 'Waiver of Claim by Subcontractor' forms signed by truck drivers for the carriers of the shrimp shipments lawfully allocated liability for the freight charges under the Interstate Commerce Act (ICA)." *Id*. at 476. The Ninth Circuit affirmed, stating that, "[b]ecause an external contract, entered into by the Carriers, lawfully allocated liability for the freight charges, resort to the allocation presumptions on the bill of lading is unnecessary." *Id*. at 479.

The language of the waivers in *C.A.R. Transportation*, in which the carriers stated that they would not seek payment from Trans-Pac or its customers, is very similar to the language in the MTA, in which Reveille agrees that it will not attempt to bill or communicate with any customers of Tropical. (Document No. 66-20 at 3, ¶ 8). In contrast, the waiver at issue in *Oak Harbor* did not address the shipper's (Sears') liability for payment of freight charges. 513 F.3d at 957. Factually, then, this case is far more similar to *C.A.R. Transportation*.

This difference is also important because in *Oak Harbor* the waiver (referred to as the "Carrier Contract") did not conflict with the bills of lading, so the Court was able to interpret them "in harmony." *Id*. at 958. It is not possible to interpret the MTA and the bills of lading "in harmony," as the two are clearly contradictory. In *Oak Harbor* the Court also stated that "if

with these contracts, they would be referred to by name therein, and not referred to as "another motor carrier or broker."

parties enter into a contract before preparing a bill of lading, and there is 'an irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former.'" *Id.* at 955 (quoting *Toyo Kisen Kaisha v. W.R. Grace & Co.,* 53 F.2d 740, 742 (9th Cir. 1931)). *See also W. India Indus., Inc. v. Tradex, Tradex Petroleum Servs.,* 664 F.2d 946, 950 n.5 (5th Cir. 1981) ("Any contradiction between the (earlier agreements) and the bills of lading must be resolved in favor of the former, unless it is clear that the parties did, as a matter of fact, intend the bills of lading to constitute a new contract, entirely superseding the earlier oral and written agreements.") (citing *Toyo,* 53 F.2d at 742) (other citations omitted). In this case, as in *C.A.R. Transportation*, the "irreconcilable repugnancies" between the bills of lading and the MTA necessitate resolution of the conflict in favor of the former: the MTA.[12]

Reveille makes much of the fact that in *Oak Harbor*, the Carrier Contract was entered into between the carrier and a broker; Sears was not a party. It is true that the Ninth Circuit stated that there was no authority for the proposition "that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading." *Id.* at 956. However, the Court also focused on the fact that the "Carrier Contract makes no express or implied statements that Sears will not pay Oak Harbor for the shipments, nor does the contract make any express or implied statements that Oak Harbor will not seek payment from Sears." *Id.* Therefore, the Court was concerned that interpreting the Carrier Contract as waiving Sears' obligation under the bills of lading would "permit a shipper to insulate itself from liability for the payment of freight charges by the simple act of using a broker." *Id.* That would not be the case here, where Lear would be insulated by a contract in which Reveille *explicitly* renounced its right to seek payment from

---

[12] The MTA was signed on August 27, 2013, while the bills of lading contain dates from October 2013-January 2014. (Document Nos. 66-12, 66-13, 66-20).

Lear.

Finally, as explained by Judge Rosen in the Drive litigation, both Darden and Trans-Pac received the protection of the waiver in *C.A.R. Transportation*, although only Trans-Pac was a party to the waiver. *Drive Logistics Ltd v. PBP Logistics LLC*, No. 14-10289, 2016 WL 3913709, at *8 (E.D. Mich. July 20, 2016) (citing *C.A.R. Transportation*, 213 F.3d at 4). Under this reasoning, then, "Lear need not have been a party to the MTA to claim the protection conferred under the provision of this agreement that waived [Reveille's] right to collect its freight charges from the customers of [Tropical]." *Id*. For all of these reasons, the Court believes that the MTA is able to waive Reveille's right to recover against Lear.

Next, the Court will consider whether the terms of the MTA do waive Reveille's right to recover against Lear. Reveille argues that they do not, as Lear is not a "customer of Tropical Logistics," as defined in the MTA. (Document No. 66 at 23). "Customer" is defined in the MTA as "various consignors and consignees or their agents" for whom Tropical "arranges the transportation of freight under its contractual agreement." (Document No. 66-20 at 1). Reveille attempts to argue that Lear cannot be a customer of Tropical, because it has explicitly disclaimed any "knowledge of or business relationship with" Tropical and does not have a contractual relationship with Tropical. (Document No. 66 at 23-24). However, it is undisputed that Lear is the consignor or consignee on each bill of lading and that Tropical arranged transportation of Lear's freight. Therefore Lear plainly falls under the definition of customer in the MTA.[13] It is immaterial whether transportation of Lear's freight was arranged through a contract or

---

[13] This argument also failed Drive. 2016 WL 3913709, at *9 ("While Plaintiff suggests that Lear does not qualify as a 'Customer' within the meaning of this waiver provision, the MTA elsewhere defines the '[C]ustomer[s]' of the PBP Defendants as the 'various consignors and consignees or their agents' with which the PBP Defendants entered into 'contractual agreement[s]' to 'arrange[ ] the transportation of freight,' (MTA at 1), and Plaintiff expressly acknowledges that Lear was either the consignor or the consignee for each of the shipments at issue in this case, (see Plaintiff's Response to Lear's Motion at 18). Consequently, Lear lies within the scope of the waiver …").

relationship with Lear or its agent.[14]

Next the Court will consider whether the MTA is an enforceable contract. If so, as detailed above, Reveille waived its right to recover against Lear. Both parties make several arguments regarding this issue, which the Court will consider in turn.

(1) Lack of consideration

Reveille argues that the MTA fails due to lack of consideration, because Reveille makes a variety of promises in the MTA, while Tropical promises nothing. (Document No. 66 at 18-19). However, Reveille's claim that Tropical makes no promises is false; Tropical promises that it will pay Reveille. The MTA states:

> Rates and Charges. […] Tropical Logistics, LLC shall pay Carrier 40 to 45 days after Tropical Logistics, LLC receipt of Carrier's invoice, shipper's bill of lading […] and other documents required by Tropical Logistics, LLC, or Customer. […]
> Payment. Carrier shall bill the rates and charges set forth in the Tender Documents for Carrier's transportation services performed under this Agreement within one hundred eighty (180) days after delivery date. Payments shall be made to carrier for its services Forty Five days (45) after Carrier's invoice is received, provided Carrier's [*sic*] has submitted all requested information/documentation.

(Document No. 66-20 at 3, ¶¶ 8, 9). Tropical's promise to pay is sufficient consideration under Michigan law. *Schier, Deneweth & Parfitt, P.C. v. Bennett*, 206 Mich. App. 281, 282, 520 N.W.2d 705 (1994) ("It is well established that one may assume original liability by a direct promise to pay for services to be rendered to another in the future.") (citing *Highland Park v. Grant-Mackenzie Co.,* 366 Mich. 430, 443-444, 115 N.W.2d 270 (1962)). Reveille's argument that there is insufficient consideration fails as a matter of law.

(2) Failure of consideration

Reveille next argues that, assuming that the consideration for the MTA was Tropical's

---

[14] *See id*. at *9 n. 12 (Lear denied being a customer of PBP, because there was an intermediary between them. However, this did not "preclude Lear from qualifying as a 'Customer' within the meaning of this term as used in the MTA.").

promise to pay, that consideration failed when Tropical did not do so. Reveille argues that this failure of consideration rescinds the entire MTA, so that Reveille "is excused from performance of any remaining obligations," including the waiver. (Document No. 66 at 19-20). In response, Lear argues that Tropical's breach of contract entitles Reveille to damages, but not to rescission of the entire agreement. (Document No. 77 at 14).

A complete failure of consideration may warrant rescission of the agreement, as "there is no enforceable contract where there is a failure of consideration." *Adell Broad. v. Apex Media Sales*, 269 Mich. App. 6, 12, 708 N.W.2d 778 (2005) (citations omitted). Failure of consideration is defined as follows:

> As applied to notes, contracts, conveyances, etc., this term does not necessarily mean a want of consideration, but implies that a consideration, originally existing and good, has since become worthless or has ceased to exist or been extinguished, partially or entirely. It means that sufficient consideration was contemplated by the parties at time contract was entered into, but either on account of some innate defect in the thing to be given or nonperformance in whole or in part of that which the promisee agreed to do or forbear nothing of value can be or is received by the promisee. It occurs where the thing expected to be received by one party and given by the other party cannot be or has not been given without fault of the party contracting to give it.

*Id*. at 12-13 (citing Black's Law Dictionary, 5th ed.). The Michigan courts have "equated a complete failure of consideration with impossibility, or at least ineffectuality, of performance." *Id*. at 13 (citing *Baith v. Knapp–Stiles, Inc.,* 380 Mich. 119, 126, 156 N.W.2d 575 (1968)). *See also Vowels v. Arthur Murray Studios of Mich., Inc.*, 12 Mich. App. 359, 363, 163 N.W.2d 35 (1968) (rescinding contract for failure of consideration, because the consideration could no longer be provided). Therefore, "failure of consideration warranting rescission is different from, and greater than, a mere breach of contract warranting an action for damages." *Adell*, 269 Mich. App. at 13. In this case, Tropical's failure to pay does not constitute a failure of consideration, but is only a breach of the contract. Nothing in these facts suggests that performance of the contract became impossible or ineffectual; Tropical's failure to pay is a standard breach of

contract and should be treated as such. Reveille's argument that there was a failure of consideration fails as a matter of law.

(3) Authority of Sobrevilla

Reveille argues the employee who signed the MTA, Sobrevilla, did not have the authority to bind Reveille, because she was only a dispatcher. (Document No. 66 at 21). Lear does not appear to dispute this issue in its filings. For example, Lear states that "whether [Sobrevilla] did or did not [have authority to execute the document] it is clear that Reveille considered itself bound…." (Document No. 68 at 8). The same is true in its response, where Lear again states "[w]hether Ms. Sobievilla [*sic*] did or did not [have] authority to sign, it is clear that Reveille considered itself bound by the contract…." (Document No. 73 at 10). Lear only discusses Sobrevilla's authority at one point in its filings, taking issue with Reveille's description of Sobrevilla as a mere dispatcher, because she "negotiated on the price terms of the contract with Tropical's principals." (Document No. 77 at 10).  Although Lear states that Reveille's claims that she was a mere dispatcher are "misleading and disingenuous," Lear does not make any argument that Sobrevilla had actual or apparent authority to bind Reveille.[15] *Id*. Without an argument to this effect, there can be no genuine issue of material fact as to Sobrevilla's authority. The Court finds that she did not have the authority to bind Reveille.

(4) Mutual assent

Each party presents arguments on the issue of mutual assent to the MTA, but the Court believes that questions of each party's assent to the terms of the MTA are not appropriate for

---

[15] Under Michigan law, "[a]pparent authority must be traceable to the principal and cannot be established by the acts and conduct of the agent." *Meretta v. Peach*, 195 Mich. App. 695, 699, 491 N.W.2d 278 (1992) (citation omitted). The test is generally "whether an ordinarily prudent person," conversant in the area at issue, would be justified in believing the individual had authority to make an agreement on behalf of the principal. *Id*. Merely listing an act of Sobrevilla's does not create a genuine issue of material fact as to her authority under this standard. In addition, Lear first raises this assertion in its reply, and "[a]rguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) (citations omitted).

resolution at summary judgment stage.

Reveille argues that the contract "is not enforceable because the parties did not mutually assent to the terms of the MTA." (Document No. 66 at 20). Reveille states: "When the parties intend that a contract will not be binding until the parties sign it, the signatures of both parties are required to give effect to the contract. There is no evidence that both Reveille and Tropical Logistics mutually agreed to the terms of the contract because *Tropical Logistics* failed to sign the MTA." *Id.* (citations omitted). Strangely, Reveille only focuses its argument on the fact that *Tropical* never assented to the MTA; Reveille does not dispute its own assent. In its response, Reveille actually admits that it signed the MTA: "Reveille signed the MTA, and by doing so demonstrated its assent to the terms of the MTA.[16] Conversely, Tropical Logistics never signed the MTA, and took no actions in furtherance of the MTA." (Document No. 74 at 25).

Lear argues that, regardless of Sobrevilla's authority to sign, Reveille assented to the terms of the contract, by acting "in accordance therewith until such time as Tropical breached its contract by its failure to pay for freight charges as promised." (Document No. 77 at 10). Lear cites *Detroit Tigers, Inc. v. Ignite Sports Media, LLC* for the proposition that "[a] signature on a contract is not required in all instances for there to be a binding agreement. Rather, a party by its actions may indicate assent and an intent to be bound." *Id.* at 11 (citing 203 F. Supp. 2d 789, 796 (E.D. Mich. 2002)).

"[A] contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian v. Domino's Pizza L.L.C.*, 273 Mich. App. 449, 453, 733 N.W.2d 766 (2006). In determining whether mutual assent exists:

> The real question is, absent language in the contract, what was the intention of the parties as to whether there was a binding contract […]? Ordinarily one of the acts forming part

---

[16] Presumably Reveille does this because it is undisputed that Sobrevilla signed the MTA; the issue is whether or not she had the authority to do so.

of the execution of a written contract is the signing of it. However, a signature is not always essential to the binding force of an agreement. Whether a writing constitutes a binding contract, even though it is not signed, or whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends upon the intention of the parties. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties.

*Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694, 418 N.E.2d 1140 (1981) (citations omitted). "Whether there was mutual assent or a 'meeting of the minds' between the contracting parties is a question of fact." *Ford Motor Co. v. Kahne*, 379 F. Supp. 2d 857, 869 (E.D. Mich. 2005). *See also Lynge*, 94 Ill. App. 3d at 694 ("It has been held that questions of intent are particularly inappropriate for summary judgment."). Therefore the issue of whether Reveille and/or Tropical demonstrated their assent to the terms of the MTA is a question for the factfinder.

(5) Third party beneficiary[17]

Lear argues that it is able to enforce the MTA, because it is a third-party beneficiary of it, (Document No. 68 at 14), while Reveille disputes this. (Document No. 74 at 18; Document No. 76 at 4). Under Michigan law,

Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

Mich. Comp. Laws Ann. § 600.1405. Under this statute, a person must be a *direct* beneficiary of

---

[17] In *Drive*, Judge Rosen relied on alternate reasoning to determine that Lear was covered by the waiver in the MTA, stating that "[t]he Michigan courts likewise have confirmed that a contractual waiver or release is not limited in its reach to the contracting parties, but may also confer benefits on third parties." 2016 WL 3913709, at *8 (citing *Romska v. Opper,* 234 Mich. App. 512, 594 N.W.2d 853 (1999); *Collucci v. Eklund,* 240 Mich. App. 654, 613 N.W.2d 402 (2000)). In both cases, the Michigan courts found that a non-party could invoke a contractual waiver or release that, by its terms, was broad enough to encompass the non-party, without considering whether the parties were third-party beneficiaries under § 600.1405. *Id.* at *8 n. 13. Therefore Judge Rosen applied this principal of law, rather than § 600.1405, to determine that the MTA was "unquestionably broad enough to encompass the breach of contract claim asserted by Plaintiff against Defendant Lear." *Id.* at *9. This Court believes that, using either analysis, Lear is clearly an intended beneficiary of the MTA, and is entitled to enforce it. For the sake of completeness the Court includes this section discussing § 600.1405.

a contract in order to enforce it. *Shay v. Aldrich*, 487 Mich. 648, 663, 790 N.W.2d 629 (2010). This is intended "to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Id*. The third-party beneficiary "may be a member of a class, but the class must be sufficiently described." *Id*.

Lear, as a customer of Tropical, is clearly an intended beneficiary of the MTA. In the MTA, Reveille promises not to bill or communicate with the customer, and promises to waive any right it has to commence an action against the customer for unpaid freight bills. (Document No. 66-20, at 3, ¶ 8). Each of these promises is obviously undertaken for the direct benefit of a third party, the customer, and therefore Reveille was aware of this upon signing. Furthermore, as discussed above, Lear is within the class of "customer" as described in the MTA. Reveille was also aware of Lear's status as a customer when it signed the MTA,[18] and knowingly contracted to provide direct benefits to Lear in the MTA. Upon review of the same language in the MTA at issue in the Drive litigation, Judge Rosen "readily" came to the same conclusion. 2016 WL 39113709 at *9 n. 13. Therefore the Court finds that Lear was an intended third-party beneficiary of the MTA, and may enforce it.

(6) Fraudulent inducement

In its response, Reveille claims that it "was fraudulently induced to sign and agree to the terms of the MTA." (Document No. 74 at 29). Reveille states that "Tropical Logistics represented to Reveille that it had a contract with Lear for the transportation of its freight, which it did not," and that "Tropical fraudulently represented its compliance with federal regulations."

---

[18] There is no dispute that Reveille was always aware that it was transporting freight for Lear. Conversely, Lear did not need to have any knowledge of the MTA in order to benefit from it. Mich. Comp. Laws Ann. § 600.1405(2)(a) ("The rights of a person for whose benefit a promise has been made, as defined in (1), shall be deemed to have become vested, [...] *without any act or knowledge on his part*, the moment the promise becomes legally binding on the promisor, unless there is some stipulation, agreement or understanding in the contract to the contrary.").

18 / 30

*Id*. at 30-32. However, in its reply, Lear does not dispute these allegations, but only states generally that this defense "does not impede Lear's position that the contract clearly defined that it was not responsible to Plaintiff for transportation costs." (Document No. 77 at 6).

As an initial matter, the Court believes that this defense may be asserted against Lear, as a third-party beneficiary of the MTA. "The third-party-beneficiary statute expressly provides that the rights of the third-party beneficiary are "subject always to such express or implied conditions, limitations, or infirmities of the contract to which the rights of the promisee or the promise are subject." *Shay*, 487 Mich. at 665 (citing Mich. Comp. Laws Ann. § 600.1405). *See also* Restatement (Second) of Contracts § 309 (1981) ("A promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee; and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity."). While Lear has the right to enforce the MTA, it must stand in the shoes of Tropical to do so. *Id*. Therefore Lear is also subject to the defense that the MTA was fraudulently induced.[19]

---

[19] In *Drive*, Judge Rosen did not come to the same conclusion. 2016 WL 3913709 at *10. There the plaintiff argued "that Lear must stand in the shoes of the PBP Defendants as it seeks to enforce the MTA's waiver provision, and that the PBP Defendants can no longer enforce this provision in light of their prior breach of a primary obligation owed under the MTA — namely, the obligation to pay Plaintiff for the shipments it carried on behalf of the PBP Defendants in accordance with the terms of the MTA." *Id*. However, Judge Rosen explained that the "stand in the shoes" limitation "is a byproduct of the Michigan law governing third-party beneficiaries," which was irrelevant because the Court held that " Defendant Lear need not attain the status of a third-party beneficiary in order to invoke the waiver provision of the MTA." *Id. See* n. 14, *supra*.

However, the Court believes that the issue of fraudulent inducement, as opposed to breach, mandates a different result. This is because fraudulent inducement means that the contract is voidable. *Whitcraft v. Wolfe*, 148 Mich. App. 40, 52, 384 N.W.2d 400 (1985) (citation omitted). If Reveille did void the MTA, then no valid contract exists, and Reveille has no duty of performance of any of its terms. Restatement (Second) of Contracts § 7 (1981) ("A promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor is often called a void contract. Under § 1, however, such a promise is not a contract at all; it is the 'promise' or 'agreement' that is void of legal effect. If the term 'contract' were defined to refer to the acts of the parties without regard to their legal effect, a contract could without inconsistency be referred to as 'void.'"). Lear cannot enforce a contract that has ceased to exist, regardless of whether it stands in Tropical's shoes.

Conversely, in *Drive*, the PBP defendants' breach (their nonpayment) did not void or rescind the entire contract (because the breach was not a failure of consideration, see section (2), *supra*). Thus, it is arguable that Drive's waiver of its right to recover against Lear persists and may be enforced by Lear, despite the PBP defendants' breach.

"Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich. App. 636, 639–40, 534 N.W.2d 217 (1995) (citations omitted). Lear does not dispute Reveille's claims that Tropical fraudulently induced it to sign the MTA, and the Court agrees that the facts demonstrate this.

However, Reveille is incorrect that Tropical's fraudulent inducement makes the MTA "unenforceable from its inception." (Document No. 74 at 33). "Fraud in the inducement to enter into a contract does not render the instrument void but merely voidable." *Whitcraft v. Wolfe*, 148 Mich. App. 40, 52, 384 N.W.2d 400 (1985) (citation omitted). Therefore, the issue becomes when, or if, Reveille sought rescission of the MTA, or whether it sought to confirm the contract and recover monetary damages thereon. *Id.* at 52-53. If a party to a contract discovers fraud in the inducement, but does not act on these findings, the party cannot argue that the contract is void. In *Hubbell, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, Jay Dee Contractors (JDC) argued that its construction contract with the city was not enforceable, because "the city failed to disclose hazardous contamination" at the site during the negotiations. 249 Mich. App. 288, 294, 642 N.W.2d 700 (2001). However, upon discovery of the contamination, JDC did not attempt to rescind the contract, but affirmed it by continuing to perform its contractual duties. *Id.* at 295. Therefore the contract was not void, but was enforceable against JDC. *Id.*

The Court believes that genuine issues of material fact exist regarding when Reveille discovered Tropical's fraud,[20] and whether Reveille responded by rescinding the contract, or by affirming it.[21] Therefore, while it is undisputed that Tropical fraudulently induced Reveille into entering the MTA, it is not clear whether that fraudulent inducement renders the contract

---

[20] Neither party presents a clear argument as to when this occurred.
[21] The issue of whether Reveille affirmed or ratified the MTA is discussed more below.

unenforceable against Reveille.

   (7) Ratification

   Lear argues that Reveille clearly ratified the MTA, by acting in accordance with its provisions. (Document No. 73 at 12). In response, Reveille insists that it did not act in accordance with the MTA, and therefore did not ratify it. (Document No. 74 at 28).

   Michigan Courts have described ratification as follows:

> Ratification takes place when one person adopts a contract made for him, or in his name, which is not binding on him because the one who made it was not duly authorized to do so. Ratification is a question of fact; and, in the great majority of instances, turns on the conduct of the principal in relation to the alleged contract or the subject of it, from which his purpose and intention thereabout may be reasonably inferred. And, generally, deliberate and repeated acts of the principal, with a knowledge of the facts, that are consistent with an intention to adopt the contract, or inconsistent with a contrary intention, are sufficient evidence of ratification.

*Star Tickets v. Chumash Casino Resort*, No. 322371, 2015 WL 6438110, at *8 (Mich. Ct. App. Oct. 22, 2015), *appeal dismissed*, 878 N.W.2d 291 (Mich. 2016) (citing *Wexford Twp v. Seeley*, 196 Mich. 634, 640; 163 N.W. 16 (1917)). Therefore, under Michigan law, if Reveille ratified the MTA, it is irrelevant whether Sobrevilla had the authority to sign the MTA. Furthermore, if Reveille ratified the MTA after the discovery of Tropical's fraud (discussed above), then the MTA remains enforceable. *Epps v. 4 Quarters Restoration LLC*, 498 Mich. 518, 553, 872 N.W.2d 412 (2015) ("A voidable contract may typically be ratified by the party with the power of avoidance, rendering the contract fully enforceable by either party.") (citations omitted). However, as the Michigan Court explains, "ratification is a question of fact." *Star Tickets*, 2015 WL 6438110 at *8. Therefore the Court will not decide this issue at summary judgment.

   Overall, genuine issues of material fact remain as to whether the contract is enforceable

against Reveille.[22] First the factfinder must decide whether there was mutual assent to form a contract. The factfinder must determine whether the parties intended the contract to be binding, despite the lack of valid signatures, and whether their actions or conduct demonstrated this assent. Second, the factfinder must determine when Reveille discovered Tropical's fraud, and if it rescinded the contract thereafter. Finally, the factfinder must determine whether Reveille ratified the contract.[23] Therefore each party's motion for summary judgment regarding Reveille's breach of contract claim is denied.

(2) Unjust enrichment

As long as Reveille still has a viable breach of contract claim against Lear (which it may if the MTA is unenforceable), the Court may not rule as a matter of law on Plaintiff's alternative theories of recovery. *Drive*, 2016 WL 3913709, at *12. "Unjust enrichment is an equitable theory of recovery that is based on an implied agreement to pay for benefits received. To recover under unjust enrichment, a claimant must prove: (1) that valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by that person; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Jupiter Enterprises, Inc v. Harrison*, No. 05-00-01914-CV, 2002 WL 318305, at *3 (Tex. App.- Dallas Mar. 1, 2002) (citations omitted). However, "[a] plaintiff generally cannot recover under a theory

---

[22] Because issues of fact remain regarding the enforceability of the MTA, the Court will not yet rule on some arguments raised by Lear, including their arguments that equitable estoppel bars Reveille's recovery, and that there was no meeting of the minds as to material terms of the bills of lading. (Document No. 68 at 20; Document No. 73 at 5). Reveille also argues that estoppel prevents Lear from relying on the MTA, but the Court will not rule on that issue before it is clear whether the MTA is an enforceable contract. (Document No. 66 at 25). If it is not, this argument is moot.

[23] As noted above, ratification may serve two purposes in this litigation. If Reveille ratified the MTA, then the authority of Sobrevilla is irrelevant. Furthermore, if Reveille's actions in ratifying the MTA took place or continued after its discovery of Tropical's fraud, then that fraud is irrelevant as well.

of unjust enrichment 'when a valid, express contract covers the subject matter of the parties' dispute.'" *Maxwell v. Neri N. Am.*, No. 4:13-CV-269, 2014 WL 2441200, at *6 (S.D. Tex. May 30, 2014) (citing *Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex. 2000)). "Because [Reveille] seeks to recover from Lear under express contracts — *i.e.,* the bills of lading for each shipment at issue — and the viability of this express breach of contract claim rests upon issues of fact concerning Plaintiff's possible waiver of this claim, any implied-contract theories of recovery must await the trier of fact's resolution of these questions." *Drive*, 2016 WL 3913709, at *12.

Furthermore, "the waiver provision in the MTA is not limited to any particular theory of recovery," but "waives *any right* [Reveille] may otherwise have to proceed or commence *any action* against any Customer for the collection of any freight bills arising out of transportation services performed by carrier under this contract." *Id.*; (Document No. 66-20 at 3, ¶ 8) (emphasis added). Similar to the case in *Drive*,

> [Reveille] does not contend that this provision, if enforceable, would extend to less than all of the theories of recovery it has asserted against Lear, nor does the Court see any basis for drawing such a distinction. Accordingly, the outstanding issues of fact concerning Lear's effort to invoke the waiver provision of the MTA preclude the Court from awarding summary judgment in either party's favor on any of the claims asserted by Plaintiff against Lear, regardless of the legal theory upon which these claims may be based.

2016 WL 3913709, at *12. Therefore both parties' motions for summary judgment are denied regarding unjust enrichment.

### (3) Negligence

"Under Texas law,[24] a negligence claim consists of four essential elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) an actual injury to the plaintiff; and (4) a showing that the breach was the proximate cause of the injury." *Whiteside v.*

---

[24] The parties, and the Court, agree that Texas negligence law applies.

*United States*, No. 1:11-CV-154, 2013 WL 2355522, at *5 (E.D. Tex. May 28, 2013) (citations omitted). "Whether a legal duty exists is a threshold question of law for the court to decide from the facts surrounding the occurrence in question. If the defendant owed no duty, it cannot be found liable for negligence." *Id.*

Lear argues that summary judgment on this claim is appropriate, because Reveille has failed to demonstrate the first prong, that Lear owed a duty to Reveille, and because Reveille's claim is in substance an action on the contract. (Document No. 68 at 17; Document No. 77 at 23). Reveille states that Lear had an affirmative duty to ensure the motor carriers providing the services were compensated for their services, and that Lear (via Ryder) owed Reveille a duty to exercise due care in selecting an appropriate carrier. (Document No. 74 at 48). The Court will consider each allegation of a duty separately.[25]

The Court will first address Reveille's claim that Ryder owed it a duty to exercise due care in selecting an appropriate carrier. *Id.* Reveille admits that Texas law has not yet addressed the existence of this duty, but states that "many courts considering less egregious actions by brokers have found that a broker owes a duty to exercise due care in selecting an appropriate carrier." *Id.* However, none of these cases are binding on this Court, nor are they directly relevant to this case.[26] Therefore Reveille has not alleged a valid legal duty, and cannot be liable for negligent hiring. *Whiteside*, 2013 WL 2355522, at *5.

---

[25] It is worth noting, though, that Reveille seeks the same damages for each breach of duty it alleges: payment for its transportation services rendered. (Document No. 63 at 10) ("Reveille has been damaged by Lear's negligence in the amount of $233,961.00 for failing to receive payment for transportation services it rendered.").

[26] For example, one case cited by Reveille imposes unrelated duties to "(1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained by FMSCA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings." *Schramm v. Foster*, 341 F. Supp. 2d 536, 551 (D. Md. 2004) (applying Maryland negligence law). Other cases mention the idea that a broker may be liable for damages to a shipment due to negligent hiring, but do not actually give rise to this liability. *Chubb Grp. of Ins. Companies v. H.A. Transp. Sys., Inc.*, 243 F. Supp. 2d 1064, 1071 (C.D. Cal. 2002); *Prof'l Commc'ns, Inc. v. Contract Freighters, Inc.*, 171 F. Supp. 2d 546, 552 (D. Md. 2001). Without persuasive case law, the Court will not impose such a duty on Lear.

Next, Reveille's claim that Lear had a duty to ensure payment of motor carriers arises solely from the contractual relationship (the bills of lading), and is not a proper tort claim. "'Tort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others.'" *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 92 at 655 (5th Ed. 1984)). However, there are situations where the acts of a party may breach duties in both tort and contract. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). *DeLanney* explains the difference between situations where the duties are simultaneous, and situations where a claim must sound in contract:

> If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

809 S.W.2d at 494. "In order to determine whether a cause of action arises in contract or tort, we must look beyond the form of the pleading and consider 'both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff.'" *UMLIC VP LLC v. T & M Sales & Envtl. Sys., Inc.*, 176 S.W.3d 595, 613 (Tex. App. 2005) (citation omitted). This is also referred to as the "economic loss rule," which "generally precludes recovery in tort where a plaintiff's only injury is an economic loss to the subject of a contract." *Worldpak Int'l, LLC v. Diablo Valley Packaging, Inc.*, No. 4:08-CV-00469, 2009 WL 1577989, at *2 (E.D. Tex. June 4, 2009), *report and recommendation adopted*, No. 4:08CV469, 2009 WL 1873784 (E.D. Tex. June 30, 2009) (citations omitted).

Any duty to ensure compensation arises from the alleged contractual relationship; if Lear has a duty to pay Reveille for its services, that duty is imposed by the bills of lading.[27] It is not a separate duty that Lear would bear, regardless of any contractual agreement. Furthermore, Reveille seeks damages for its loss in the exact amount owed to it under the bills of lading. (Document No. 63 at 10) ("Reveille has been damaged by Lear's negligence in the amount of $233,961.00 for failing to receive payment for transportation services it rendered."). "When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *DeLanney*, 809 S.W.at 494. *See also Worldpak*, 2009 WL 1577989 at *2 ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.") (citations omitted). The claim that Lear had a duty to ensure Reveille's compensation sounds only in contract law, and is barred by the economic loss rule.

For these reasons the Court finds that Reveille's negligence claim fails, and will grant summary judgment in favor of Lear.

(4) Fraud by nondisclosure

Reveille does not seek summary judgment on its claim of fraud by nondisclosure, but Lear seeks dismissal of the claim, arguing that Reveille does not state a claim for fraudulent nondisclosure, as Reveille has not alleged the particulars of the misrepresentations under Rule 9. (Document No. 68 at 17). Furthermore, Lear argues that Reveille "has not alleged that there was a fiduciary or confidential relationship" between Lear and Reveille, and states that Lear "did not voluntarily disclose any information to Reveille…partial or otherwise…nor make any representations to it of any kind." *Id*. at 18.

In response, Reveille argues that its pleadings are sufficient, as they "plead the specific

---

[27] For example, Reveille cites to *Southern Pacific Transportation Co. v. Commercial Metals Co.* for the premise that "Lear, as the shipper, owed a duty to Reveille to pay the freight charges owed to it." (Document No. 74 at 48) (citing 456 U.S. at 343-44). But that case imposed liability via the bill of lading, not negligence.

facts not known to it on which it bases its claim for fraud by nondisclosure, the persons to whom the information was known, and the motivation behind the nondisclosure." (Document No. 74 at 46). Furthermore, Reveille argues that:

> [E]ach time Lear issued a bill of lading to Reveille with Reveille's name as the carrier and tendered its freight to Reveille, Lear represented to Reveille that it sought Reveille's transportation services in accordance with the terms of the bill of lading and that if Reveille performed such transportation services, then Reveille would be paid in accordance with the terms of the bill of lading. Thus, when Lear obtained new information that PBP, the party to whom Lear was tendering Reveille's payments, was unable or failed to pay the actual motor carriers, Lear had an obligation to disclose that information to Reveille because the new information made Lear's prior representations misleading and untrue, which conveyed a false impression.

*Id*. at 46-47.

In its reply, Lear states that the bills of lading cannot be said to be "representations" on the part of Lear, because "Lear never agreed and/or represented that Reveille would be paid according to the terms of these bills of lading and in fact agreed separately with its contract carrier to pay that party at a different rate. Having made no representations of any kind to Reveille, there can be no 'new information [that] makes the earlier misrepresentation misleading or untrue.'" (Document No. 77 at 22).

"Claims of fraud by nondisclosure are [] subject to Rule 9's heightened pleading standard." *Bittick v. JPMorgan Chase Bank, NA*, No. 4:11-CV-812-A, 2012 WL 1372126, at *6 (N.D. Tex. Apr. 18, 2012). Although "[t]he particularity demanded by Rule 9(b) necessarily differs with the facts of each case," Courts have explained that it generally "requires the plaintiff to allege the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067–68 (5th Cir. 1994) (citations and internal quotations omitted).

"For common-law fraud based on nondisclosure, a plaintiff must allege (1) defendants concealed or failed to disclose a material fact that they knew the plaintiff was ignorant of or did not have the opportunity to discover, (2) that they intended to induce plaintiff to take some action by concealing or failing to disclose the material fact, and (3) that he suffered as a result of acting on the Defendants' nondisclosure." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. CIV.A. G-03-0481, 2010 WL 9077875, at *20 (S.D. Tex. Jan. 19, 2010) (citations omitted). "Moreover, the defendant must have had a duty to disclose this information." *Id.* "Under Texas law, an affirmative duty to disclose may arise under four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses new information, he must disclose the whole truth; (3) when a person makes a representation and new information makes the earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression." *Id.*

In its Second Amended Complaint, Reveille alleges that Lear and Ryder continued to pay PBP when they were aware that it was experiencing financial difficulty and was not paying the actual transporting carriers. (Document No. 63 at 10-11). Lear and Ryder concealed these material facts from Reveille, despite their duty to disclose, in order "to ensure its freight would continue to be hauled without interruption to its business operations." *Id*. at 11. Reveille also states that "Lear was deliberately silent when it had a duty to speak. As soon as it obtained any knowledge regarding PBP's nonpayment of carriers, Lear had a duty to inform Reveille." *Id.* Reveille alleges that Lear or Ryder owed it a duty to disclose, but offers no details on this duty whatsoever. The Court agrees that this is insufficient to state a claim against Lear. *Bittick*, 2012 WL 1372126 at *6 (plaintiff failed to state a claim of fraud by nondisclosure where he did not allege what duty defendants owed him); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,

28 / 30

490 F. Supp. 2d 784, 822 (S.D. Tex. 2007) ("Plaintiffs must allege facts demonstrating with particularity that [defendants] had a duty to disclose, but Plaintiffs have failed to do so." Although Plaintiffs have adequately explained situations in which a duty to disclose may arise, "Plaintiffs have failed to allege facts relating to specific misrepresentations made by [defendants] to correspond to any of these situations."). Although the source of the duty is unclear from the allegations in the Second Amended Complaint, it appears from Reveille's response that Reveille intends to allege a duty to correct a previous misrepresentation. However, allegations in a response "are not part of the pleadings to be considered for purposes of the motion to dismiss." *Gipson v. Deutsche Bank Nat'l Trust Co.*, No. 3:13-CV-4820-L (BH), 2014 WL 11515582, at *5 (N.D. Tex. Dec. 18, 2014), *report and recommendation adopted sub nom. Gipson v. Deutsche Bank Nat. Trust Co.*, No. 3:13-CV-4820-L, 2015 WL 2079514 (N.D. Tex. May 4, 2015) (citations omitted). Without these details, it is unclear what duty Lear or Ryder owed to Reveille (or even what misrepresentations they had a duty to correct), and Reveille's mere assertion that a duty existed is not sufficient under Rule 9(b). Reveille's claim of fraudulent nondisclosure will be dismissed.

## Conclusion

For the reasons stated above, the Court hereby

ORDERS that both parties' motions for summary judgment (Document Nos. 66, 67, 68) are denied regarding the breach of contract claim and the unjust enrichment claim. The Court also

ORDERS that Lear's motion for summary judgment (Document No. 68) is granted as to Reveille's negligence claim. Finally, the Court

ORDERS that Lear's motion to dismiss Reveille's fraudulent nondisclosure claim

pursuant to Rule 9(b) (Document No. 68) is granted. That claim will be dismissed.

SIGNED at Houston, Texas, this 16th day of February, 2017.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE